NOT DESIGNATED FOR PUBLICATION

| STATE OF LOUISIANA IN THE INTEREST OF L.R. | * | NO. 2019-CA-0843 |
|---|---|---|
| | * | |
| | | COURT OF APPEAL |
| | * | |
| | | FOURTH CIRCUIT |
| | * | |
| | | STATE OF LOUISIANA |

* * * * * * *

APPEAL FROM
JUVENILE COURT ORLEANS PARISH
NO. 2018-093-01-DQ-E/C, SECTION "C"
Honorable Candice Bates Anderson, Judge

* * * * * *

**Judge Rosemary Ledet**

* * * * * *

(Court composed of Judge Edwin A. Lombard, Judge Rosemary Ledet, Judge Paula A. Brown)

**LOMBARD, J., CONCURS IN RESULT WITH THE REASONS SET FORTH BY J. BROWN AND ASSIGNS ADDITIONAL REASONS; BROWN, J., CONCURS IN THE RESULT WITH THE REASONS SET FORTH BY J. LOMBARD AND ASSIGNS ADDITIONAL REASONS**

Katherine M. Franks
LOUISIANA APPELLATE PROJECT
P.O. Box 220
Madisonville, LA 70447

      COUNSEL FOR APPELLANT

Leon Cannizzaro, District Attorney
Donna Andrieu, Assistant District Attorney
Scott Vincent, Assistant District Attorney
DISTRICT ATTORNEY'S OFFICE
ORLEANS PARISH
619 S. White Street
New Orleans, LA 70119

      COUNSEL FOR APPELLEE

**AFFIRMED**

**DECEMBER 13, 2019**

This is a juvenile delinquency case. The juvenile, L.R.,[1] appeals his

adjudication and disposition for attempted second degree murder, armed robbery,

illegal use of a weapon during a crime of violence, and illegal possession of a

firearm by a juvenile. For the reasons that follow, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

On the evening of March 26, 2019, D.S. (then 21 years old) and P.R. (then

19 years old) were together in their apartment in the Laguna Run Apartments,

located in New Orleans, Louisiana. At approximately 11:15 p.m., they left the

apartment to walk to a nearby store to purchase drinks and snacks.

As they were walking, a silver vehicle pulled up beside them. One of the

occupants of the vehicle asked them if they wanted to purchase some marijuana.

They responded in the negative. The vehicle then drove off, and they continued

walking. They arrived at the store, made their purchases, and began walking home.

---

[1] Pursuant to La. Ch.C. art. 412 and Rule 5-2 of the Uniform Rules of the Courts of Appeal, the juvenile is referred to by his initials to preserve the confidentiality of these proceedings.

As they were walking home, the same silver vehicle pulled up beside them again. One of the occupants asked them if they had a dollar. They responded in the negative. At that point, the same occupant—a short, thinly-build, young,[2] black male wearing a black hooded sweatshirt with the hood up—exited the vehicle; brandished a silver, semi-automatic handgun; and instructed D.S. and P.R. to give him everything in their pockets. They refused, and turned to walk away. The perpetrator fired a shot into D.S.'s lower back. The bullet paralyzed D.S., and he fell to the ground paralyzed. P.R. ran. As D.S. lay on the ground, the perpetrator went through his pockets, found his wallet, and took the money in it—five one-dollar bills. The perpetrator returned to the vehicle, and the vehicle drove away.

These events were observed by the driver of a passing vehicle. On hearing the shot, the driver made a U-turn and returned to the scene. As he arrived, P.R., who had called 911, also returned to the scene. The police and EMS arrived shortly after and transported D.S. to a nearby hospital, where he underwent surgery. Later that night, P.R. was also transported to the hospital.

New Orleans Police Department ("NOPD") Detective Shondell Fields was assigned to the case as the lead investigator. She spoke with D.S. and P.R. at the hospital on the night of the shooting, and they provided her a description of the perpetrator. Through her investigation, Detective Fields learned that the description of the perpetrator was consistent with the description of a suspect in a stolen

---

[2] D.S. described the perpetrator as "a whole child."

vehicle case being investigated by one of her colleagues. The suspect in that case was L.R.

Detective Fields compiled two photographic lineups—one to be shown to D.S.; one to be shown to P.R.—each containing a photograph of L.R. Three days after the shooting, Detective Williams and another NOPD Detective, Alden Moton, went to the hospital to show the lineups to D.S. and P.R.. On being shown the lineups by Detective Moton, P.R. identified L.R. as the perpetrator; D.S. identified a different individual.

On April 3, 2019, the State filed a delinquency petition accusing L.R. of attempted second degree murder,[3] armed robbery,[4] illegal use of a weapon during a crime of violence,[5] and illegal possession of a firearm by a juvenile.[6] On May 7, 2019, L.R. entered an answer denying the charges. On July 1, 2019, the case proceeded to an adjudication hearing. At the conclusion of the hearing, the juvenile court adjudicated L.R. delinquent as to each count. On August 26, 2019, the juvenile court held a disposition hearing. At the conclusion of the hearing, the juvenile court entered a judgment of disposition committing L.R. to the custody of the Office of Juvenile Justice ("OJJ") as follows:

- Attempted second degree murder: juvenile life;[7]

---

[3] La. R.S. 14:30.1.

[4] La. R.S. 14:64.

[5] La. R.S. 14:94(F).

[6] La. R.S. 14:95.8.

[7] "Juvenile life" is the maximum sentence that can be imposed on a juvenile delinquent—commitment to OJJ custody until age 21. *See generally* La. Ch.C. art. 898.

3

- Armed robbery: juvenile life;

- Illegal use of a weapon during a crime of violence: six months; and

- Illegal possession of a firearm by a juvenile: six months.

The juvenile court ordered these sentences to run concurrently and recommended that they be served in secure care. This appeal followed.

## ERROR PATENT REVIEW

We have reviewed the record for errors patent, and find none. *See State in Interest of W.B.*, 16-0642, p. 4 (La. App. 4 Cir. 12/7/16), 206 So.3d 974, 978 (observing that "this court adopted a practice of conducting an error patent review in juvenile delinquency cases").

## DISCUSSION

L.R. assigns the following two errors on appeal: (1) that the evidence is insufficient to support his adjudications; and (2) that his disposition is excessive. We address each assignment in turn.

**Sufficiency**

When reviewing the sufficiency of the evidence in juvenile cases, the standard of review is whether, viewing all of the evidence in the light most favorable to the prosecution, the juvenile court committed manifest error in finding beyond a reasonable doubt that the juvenile committed a delinquent act. *See State ex rel. C.N.*, 11-0074, pp. 4-5 (La. App. 4 Cir. 6/29/11), 69 So.3d 711, 714 (discussing in detail the constitutional, statutory, and jurisprudential underpinnings of this standard of review).

4

In this case, the juvenile court adjudicated L.R. delinquent for attempted second degree murder, armed robbery, illegal use of a weapon during a crime of violence, and illegal possession of a firearm by a juvenile—all stemming from the March 26, 2019 armed robbery and shooting of D.S.. L.R. does not contend that the State failed to prove that these offenses occurred; instead, he contends that the State failed to prove that he was the perpetrator.

L.R. first points out that, although there was potential physical evidence that, if tested, could have conclusively established the identity of the perpetrator, the State failed to conduct such testing. As L.R. concedes, however, it is well-settled that, even "[w]here there is no physical evidence to link a defendant to the crime charged, the testimony of one witness, if believed by the trier of fact, is sufficient support for a factual conclusion required for a verdict of guilty." *State v. Marcantel*, 00-1629, p. 9 (La. 4/3/02), 815 So.2d 50, 56. Such is the case here. At trial, both D.S. and P.R. positively identified L.R. as the perpetrator.

Nonetheless, L.R. points out that recent research has demonstrated the fallibility of eye-witness identifications and that, in light of such research, the Legislature recently amended the Louisiana Code of Evidence to permit expert testimony on the issues of memory and eyewitness identification. *See* La. C.E. art. 702(B).[8] L.R. further points out that, in the out-of-court lineup procedure, D.S. did not identify him as the perpetrator; indeed, D.S. identified a different person. L.R. still further points out that it was not until D.S. observed L.R. in court, attended by

_____

[8] No such evidence was presented to the juvenile court.

5

counsel, that D.S. identified him as the perpetrator. In light of these issues, L.R. contends that the juvenile court erred in assigning weight to these in- court identifications.

Essentially, this argument invites us to reweigh the evidence at trial. It is well settled that, in assessing the sufficiency of the evidence, "[i]t is not the function of an appellate court to assess credibility or reweigh the evidence." *State v. Smith*, 94-3116, p. 2 (La. 10/16/95), 661 So. 2d 442, 443. This rule operates even under the broader manifest error standard of review applicable in juvenile delinquency cases. *See State ex rel. G.B.*, 07-1577, p. 3 (La. App. 4 Cir. 5/14/08), 985 So.2d 828, 830 (citing *Smith*, *supra*); *see also Rosell v. ESCO*, 549 So.2d 840, 844-45 (La. 1989)).[9]

---

[9] In *Rosell*, the Louisiana Supreme Court set forth as follows the general principles that guide manifest error review:

> It is well settled that a court of appeal may not set aside a trial court's or a jury's finding of fact in the absence of "manifest error" or unless it is "clearly wrong," and where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. The appellate review of fact is not completed by reading only so much of the record as will reveal a reasonable factual basis for the finding in the trial court, but if the trial court or jury findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong. In applying the manifestly erroneous—clearly wrong standard to the findings below, appellate courts must constantly have in mind that their initial review function is not to decide factual issues *de novo*.

> When findings are based on determinations regarding the credibility of witnesses, the manifest error—clearly wrong standard demands great deference to the trier of fact's findings; for only the factfinder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said. Where documents or objective evidence so contradict the witness's story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable fact finder would not credit the witness's story, the court of appeal may well find manifest error or clear wrongness even in a finding purportedly based upon a credibility determination. But where such factors are not

In this case, as previously discussed, the juvenile court's finding that L.R. was the perpetrator of the crimes set forth in the delinquency petition was based on two in-court identifications. No objective evidence contradicts these identifications, and the identifications are neither internally inconsistent nor implausible on their face.[10] Accordingly, we find the in-court identifications sufficient to support the juvenile court's adjudication. L.R.'s first assignment of error is, thus, without merit.

**Excessiveness**

Although L.R. concedes that "because of his background [he] is in need of a custodial environment other tha[n] the dysfunctional homes he has lived in," he contends that "a less onerous disposition . . . than a juvenile life sentence in secure care, possibly in a secure residential psychiatric facility, would have been more appropriate under the circumstances of this case." This court has set forth the following analytical framework for reviewing a juvenile's claim that his disposition is excessive:

> In any review for excessiveness, the appellate court must first ascertain whether the lower tribunal took cognizance of the general guidelines provided for juvenile cases in Louisiana Children's Code Article 901, and whether the record reflects an adequate factual basis for the commitment imposed. Following that determination, the reviewing court need only explore for constitutional excessiveness in

---

> present, and a factfinder's finding is based on its decision to credit the testimony of one of two or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong.

549 So.2d at 844-45 (internal citations omitted).

[10] L.R. the contends that the identifications were "based on less than a forty-five second terrifying night encounter with a perpetrator who was wearing a hoodie to obscure his face." P.R. testified, however, that, although the perpetrator's hood was up, he could plainly see his face; and D.S. provided detailed testimony about the perpetrator's appearance.

light of the circumstances of the case and the background of the juvenile. Absent a showing of manifest abuse of the wide discretion afforded in such cases, a disposition will not be set aside as constitutionally excessive.

*State ex rel. D.M.*, 02-2528, pp. 9-10 (La. App. 4 Cir. 7/2/03), 851 So.2d 1216, 1222 (internal citations, quotations marks, and alterations omitted). Thus, appellate review of a juvenile's claim that his disposition is excessive presents two issues: statutory excessiveness and constitutional excessiveness. We address each issue separately.

### Statutory Excessiveness

L.R. contends that his commitment to OJJ custody—rather than a secure psychiatric facility—renders his disposition excessive. A juvenile court is prohibited from removing a child from the custody of his parents "unless his welfare or the safety and protection of the public cannot, in the opinion of the court, be adequately safeguarded without such removal." La. Ch.C. art. 901(A). Even then, a juvenile court must impose "the least restrictive disposition authorized by Articles 897 through 900 of this Title which the court finds is consistent with the circumstances of the case, the needs of the child, and the best interest of society." La. Ch.C. art. 901(B).

Nonetheless, when, as here, a juvenile has been adjudicated delinquent for a felony-grade act, a juvenile court "may commit the child to the custody of the Department of Public Safety and Corrections, with or without a recommendation that the child be placed in alternative care facilities through the department's client placement process, or be referred to appropriate placement resources in the state

8

available through other public or private agencies." La. Ch.C. art. 897(D). Such

commitment may be appropriate if any of the following circumstances exists:

> (1) There is an undue risk that during the period of a suspended commitment or probation the child will commit another crime.
>
> (2) The child is in need of correctional treatment or a custodial environment that can be provided most effectively by his commitment.
>
> (3) A lesser disposition will deprecate the seriousness of the child's delinquent act.
>
> (4) The delinquent act involved the illegal carrying, use, or possession of a firearm.

La. Ch.C. art. 901(C).

From the transcript of the disposition hearing, it is clear that the juvenile

court found that all of these circumstances existed. First, the record reflects that

L.R.—who was thirteen at the time of these offenses—has an extensive history of

delinquency, presenting an undue risk that during any period of suspended

commitment or probation, L.R. would commit another crime.[11] Second, the

juvenile court repeatedly noted that L.R.'s delinquent acts had permanently

paralyzed the victim, suggesting that the juvenile court believed that a lesser

disposition would deprecate the seriousness of L.R.'s delinquent acts. Third, in

adjudicating L.R. delinquent for illegal use of a of a weapon during a crime of

violence and illegal possession of a firearm by a juvenile, the juvenile court

---

[11] The Pre-Dispositional Investigation Report reflects that, in addition to the instant case, L.R. had been adjudicated delinquent in four other cases and that he was awaiting adjudication in four additional cases, for acts including, simple battery; simple burglary; illegal possession of stolen things; numerous instances of unauthorized use of a motor vehicle; aggravated assault with a firearm; and manufacture, distribution, or possession with the intent to distribute marijuana.

necessarily found that the attempted second degree murder and the armed robbery involved the illegal carrying, use, and possession of a firearm.

Most importantly, however, the juvenile court found that L.R. is in need of a custodial environment that can be provided most effectively by his commitment. In making that determination, the juvenile court noted that L.R.'s conduct had improved in pre-adjudication custody. The juvenile court noted that, in pre-adjudication custody, L.R. had been the top student in his class and had demonstrated leadership by helping other students with their schoolwork. The juvenile court further noted as follows:

> So I just want you to be clear that all the [negative] things that you're telling me that jail will do for [L.R] has proven to be the exact opposite. That [L.R.] is going to school, doesn't have 46 days absent, didn't have 66 tardies, that [L.R] is not running the street after curfew, that [L.R.] is not taking vehicles that don't belong to him. That [L.R.] is not brandishing guns and carrying weapons. That [L.R.] is not shooting at people who only want the opportunity to just leave their apartment for a couple of hours to get some snacks to watch a movie.

> Instead [L.R.] is far surpassing what any of us expected of him. So at what point is this trauma that I should be so concerned about that's going to occur to him if he's in jail happens because what I see is that [L.R.] is having an opportunity to do something different, that [L.R.] is having an opportunity to make different choices and he's taking advantage of those choices and I'm going to allow him to have the opportunity to continue to take advantage of those choices

Nonetheless, L.R. contends that the juvenile court failed to consider more "creative alternatives" before sentencing him to OJJ custody. The Children's Code, however, does not require a juvenile court to consider creative alternatives; it requires only that a juvenile court impose the "least restrictive disposition . . .

consistent with the circumstances of the case, the needs of the child, and the best interest of society."

Regarding the needs of the child, L.R. contends that he requires intensive psychiatric treatment for post-traumatic stress disorder.[12] He represents that OJJ has placed him in a secure facility which he characterizes as "one of the most dangerous juvenile facilities in the state." He contends that such placement renders his disposition excessive.

There are three problems with this argument. First, as previously discussed, the juvenile court found that L.R. had demonstrated satisfactory improvement in a traditional custodial environment and in the absence of any psychiatric treatment.[13] Second, the argument is dependent on non-record facts; neither the location of L.R.'s custodial placement nor that facility's relative safety is a matter of record before this court. Third, even if L.R.'s extra-record representations were accurate, neither representation is relevant to the question of whether he is receiving

---

[12] The record reflects that at an early age, L.R. witnessed the immediate aftermath of the murder of two siblings and an uncle. Not long afterwards, L.R. witnessed the immediate aftermath of the murder of his mother. L.R. also suffered physical and emotional abuse at the hands of his father. The trauma of these events, a defense expert in childhood trauma testified, left L.R. suffering from "severe to extreme" post-traumatic stress disorder, for which, to date, L.R. has never received treatment. The expert recommended that L.R. "receive psychiatric treatment in a residential treatment facility for anywhere from two to three years where he can really address the extreme level of trauma that he's experienced" and that such treatment take place "in a setting where he can have the correct comfortably appropriate kind of trauma treatment with competent therapist[s] who know the difference between trauma treatment and regular treatment" and "continued supervision by a psychiatrist to be able to understand when his treatment would be complete." The juvenile court inquired whether "that treatment [could] be obtained at any type of facility." In response, the expert emphasized that her recommendation was limited to the nature of the treatment—not the facility in which such treatment would be provided.

[13] Nonetheless, the juvenile court ordered that OJJ provide L.R. mental health treatment while in custody.

11

appropriate treatment at the facility; instead, the argument merely assumes that he is not.

In any event, given L.R.'s history of delinquency, the gravity of the violent acts for which he was adjudicated delinquent in this case, his lack of remorse for those acts, his unwillingness to admit responsibility for those acts after adjudication, and his positive response to a traditional custodial environment, we cannot say that the juvenile court's decision to commit him to OJJ custody for the duration of his sentence renders his sentence statutorily excessive.[14]

### Constitutional Excessiveness

"A juvenile has the same constitutional rights against excessive punishment as an adult." *State in Interest of R.C.*, 16-0966, p. 2 (La. App. 4 Cir. 12/28/16), 208 So.3d 962, 964. A sentencing court has "wide discretion in the imposition of [a] sentence within statutory limits" and a sentence imposed "should not be set aside as excessive in the absence of a manifest abuse of his discretion." *State v. Sepulvado*, 367 So.2d 762, 767 (La. 1979). In this case, the sentence imposed—

---

[14] Indeed, had L.R. been one year older on the date he committed the delinquent acts in this case, the juvenile court would have been required to impose on him a disposition of juvenile life in OJJ custody. *See* La. Ch.C. art. 897.1(A) (providing that, "[a]fter adjudication of a felony-grade delinquent act based upon a violation of R.S. 14:30, first degree murder or R.S. 14:30.1, second degree murder, the court shall commit the child who is fourteen years or older at the time of the commission of the offense to the custody of the Department of Public Safety and Corrections to be confined in secure placement until the child attains the age of twenty-one years without benefit of parole, probation, suspension of imposition or execution of sentence, or modification of sentence"); La. Ch.C. art. 897.1(C) (providing that, "[a]fter adjudication of a felony-grade delinquent act based upon a violation of R.S. 14:64, armed robbery, the court shall commit the child who is fourteen years of age or older at the time of the commission of the offense to the custody of the Department of Public Safety and Corrections to be confined in secure placement without benefit of probation or suspension of imposition or execution of sentence").

effectively eight years—is within the statutory limit of both attempted second degree murder and armed robbery.[15]

Nonetheless, it is well-settled that "the imposition of a sentence, although within the statutory limit, may violate a defendant's constitutional right against excessive punishment." *Sepulvado*, *supra*. Such a sentence is excessive and unconstitutional "if it is grossly out of proportion to the severity of the crime or if it is nothing more than the purposeless and needless imposition of pain and suffering." *State v. Bonanno*, 384 So. 2d 355, 357 (La. 1980).

The disposition imposed in this case is not grossly out of proportion to the severity of L.R.'s delinquent acts—crimes of violence that left the victim paralyzed for life and for which L.R. has shown no remorse. Nor is the disposition the purposeless and needless imposition of pain and suffering. As previously discussed, numerous considerations militated in favor of a custodial sentence; and as the juvenile court noted, L.R. had already demonstrated improvement in a pre-adjudication custodial environment. As for the duration of the disposition, the juvenile court's written judgment states that, "[u]pon reaching the age of 17, should the juvenile have obtained his high school diploma, obtained two trades, and have minimal code of conduct violations, the Court will entertain releasing the juvenile at that time"—effectively reducing the disposition by half. Such a

---

[15] Indeed, it is below the statutory minimum. *See* La. R.S. 14:30.1 (providing that "[w]hoever commits the crime of second degree murder shall be punished by life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence"); La. R.S. 14:27(D)(1)(a) (providing that "[w]hoever attempts to commit any crime shall be . . . imprisoned at hard labor for not less than ten nor more than fifty years without benefit of parole, probation, or suspension of sentence"); La. R.S. 14:64(B) (providing that "[w]hoever commits the crime of armed robbery shall be imprisoned at hard labor for not less than ten years and for not more than ninety-nine years, without benefit of parole, probation, or suspension of sentence").

condition reflects that the purpose of the disposition was to rehabilitate L.R., not merely to punish him. L.R.'s second assignment of error is without merit.

## **DECREE**

For the foregoing reasons, the adjudication and disposition are affirmed.

**AFFIRMED**